# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **SCHNEIDER SADDLERY CO., INC.,** | : | **Case No. 1:06-CV-02602** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN** |
| | : | **O'MALLEY** |
| **v.** | : | |
| | : | |
| **BEST SHOT PET PRODUCTS** | : | <u>**MEMORANDUM & ORDER**</u> |
| **INTERNATIONAL, LLC,** | : | |
| | : | |
| **Defendant.** | : | |

Before the Court are Cross-Motions for Partial Summary Judgment (Docs. 74, 75, and 76) and Plaintiff Schneider Saddlery Company, Inc.'s ("Schneider") Motion to Strike Certain Evidence from Defendant Best Shot Pet Product International, LLC's ("Best Shot") Moving Papers (Doc. 90).  As more fully explained below, this Court:

- <u>**DENIES**</u> Schneider's Motion to Strike evidence submitted by Best Shot to the extent that it asks that such evidence be stricken from the record, <u>**PARTIALLY GRANTS**</u> this Motion to the extent that it asks the Court not to consider Best Shot's unauthenticated photographs for purposes of summary judgment, and <u>**DENIES**</u> the Motion in entirety with respect to Best Shot's expert report.  (Doc. 90.)

- <u>**DENIES**</u> Schneider's Motion for Partial Summary Judgment on Schneider's claim of trademark infringement and trademark counterfeiting.  (Doc. 76.)

- <u>**GRANTS**</u> Best Shot's Motion for Partial Summary Judgment with respect to Schneider's claim of trademark counterfeiting, but <u>**DENIES**</u> Best Shot's request for attorney's fees at this time.  (Doc. 75.)

- <u>**DENIES**</u> Best Shot's Motion for Partial Summary Judgment with respect to Schneider's claim for money damages.  (Doc. 74.)

## I. BACKGROUND

This dispute is between two companies that sell directly competing equine grooming products. Schneider contends that Best Shot's current trademarks infringe upon Schneider's intellectual property rights. While the parties each sell a variety of other goods that may ultimately be implicated by this lawsuit, the instant motions are directed only at Best Shot's marks as they are used to promote various equine grooming products.[1]

The factual predicate for this case dates to 1984, when Schneider introduced a line of horse grooming products that it branded with the singular word "ULTRA" ("Schneider Marks"). (Doc. 77 at ¶ 4.) Schneider received registration for these marks in 1985 and these marks are now incontestable as a matter of law. (*Id*. at ¶ 6.)[2]

In 1990, Best Shot began selling grooming products targeted at a variety of animals, but not horses. (Doc. 75 Ex. A at 29-30.) These products included the word "ultra" in their names, although there is no allegation that Best Shot was aware of Schneider at this time. (*Id*. at 33.)[3]

---

[1] Although Schneider seeks injunctive relief against <u>any</u> use of the Best Shot Marks (*see* Compl. at 12.), Schneider's Partial Motion for Summary Judgment appears directed only at the use of this mark in the equine industry (Doc. 76). To the extent that Schneider may have intended to seek a ruling that any use of the marks by Best Shot would constitute infringement, its motion is also **DENIED**. Indeed, it appears from the current record that such a claim would be particularly weak. (*See, e.g.*, Doc. 84 Ex. A ("Question: [J]ust so I'm clear, if Best Shot utilized this label and only sold in the dog and cat industry, you'd be fine with that, correct? Answer: Yes, I would.").)

[2] The Lanham Act provides that a registered trademark becomes incontestable after five years. *See* 15 U.S.C. § 1065. The importance that the parties attach to that incontestability, however, is quite different.

[3] Although it appears from briefing (and from the letter (Doc. 76 Ex. 2), discussed *infra*.) that these non-equine products were called "Ultra Wash," "Ultra Plenish" and "Ultra Vitalizing Mist," that is not entirely certain – unfortunately, Best Shot's citation for this point appears to have been in error. (*See* Doc. 75 at 5.) The Court has no particular reason to doubt this contention, but cannot properly consider it. In any event, while this information would provide helpful background, it is ultimately immaterial to the resolution of the instant motions.

The current owner purchased Best Shot in 2000, and, in 2001, expanded Best Shot's line of grooming products to horses.  (*Id*. at 15-16 and 32.)  Best Shot uses the registered trademarks "ULTRA WASH," "ULTRA PLENISH," and "ULTRA VITALIZING MIST" ("Best Shot Marks") for its line of equine products.  (*Id*. at 33.)

Prior to registering the Best Shot Marks for use in the field of equine care, Best Shot asked its attorneys to perform a search to determine if its usage of these marks was permissible.  On November 2, 2001, Best Shot's trademark attorney memorialized the results of that search in a letter.  In relevant part, the attorney wrote:

> As we discussed on the telephone, we are preparing federal trademark applications to protect your marks ULTRA WASH, ULTRA PLENISH, and ULTRA VITALIZING MIST.  These marks have been and are used presently on products sold for use as shampoos and other hair treatments for cats and dogs.  You have used these marks since as early as 1991.
>
> We did not find trademark applications or registrations for "Ultra Wash," "Ultra-Plenish" or "Ultra Vitalizing Mist" for use as a shampoo, conditioner or coat finisher in the equestrian -field. You had indicated on the telephone that you had found the same.  But, our further search found registrations for the marks ULTRA, for shampoo and hair treatments for horses, in use since 1984, belonging to Schneider Saddlery Co., Inc., of Mayfield Heights, Ohio…. We are concerned because these registrations are close to your marks and we wanted to bring this to your attention and discuss the issues associated with them as we proceed with registration….
>
> My preliminary search of "Ultra" showed over 6000 registrations. Of those, 7 registrations included the word "Ultra" for use as a shampoo, conditioner or coat finisher in the equestrian field. Many of the hits including "ultra" are either cancelled or abandoned, probably because they could not overcome the likelihood of confusion issue.
>
> The number of registrations and uses would lead to the conclusion that the mark is a weak mark. The basic issue is whether or not use of the mark in connection with the goods or services would be likely to cause confusion, mistake, or deception as to the source of origin of those goods or services.

(Doc. 76 Ex. 2.)

3

Notwithstanding the concerns referenced in the above letter, Best Shot applied for registration of these marks.  In its registration, Best Shot did not explain to the Patent and Trademark Office ("PTO") that these marks were intended for use in the field of equine care, nor that the Schneider products already existed in that market space.  (Doc. 75 Ex. B at 109-110, 118.)  It was against this backdrop that Best Shot's applications were granted by the PTO.  (*Id*. at 90-91.)[4]

In the time that Best Shot has employed these marks, Schneider has not experienced any identifiable instance of consumer confusion or any significant decrease in profits.  (Doc. 75 Ex. F at 52, 215.)  It is true, however, that Schneider's sales decreased in the only catalog known to carry both parties' products.  Schneider also notes that the actual purchasers of equine grooming products tend to be quite unsophisticated and thus might not notice that they were purchasing the wrong product.  (Doc. 77 at  ¶¶ 9-10.)

Schneider itself did not notice Best Shot's use of these marks until April, 2006 when one of Schneider's employees passed by a Best Shot trade-booth.  (*Id*. at ¶ 7.)  Shortly thereafter, Schneider sent Best Shot a cease and desist letter.  (Doc. 77 Ex. 2.)

Best Shot maintained that their product names did not violate Schneider's marks, and the instant lawsuit ensued.

## II. THE LAW OF TRADEMARKS

The Federal Trademark Act ("Lanham Act") prohibits the use in commerce of a "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale . . . or advertising of any goods or services . . . [that] is likely to cause confusion, or . . .

---

[4]  Best Shot also notes that Schneider did not contest any of its trademark applications, but the significance of this observation is negligible at most on these facts.  It might be different, of course, if the holder of a registered mark initially failed to contest a new mark that was subject to an extremely public unveiling prior to registration.

mistake." 15 U.S.C. § 1114(1).  To prove trademark infringement, Schneider must show: (1) ownership of a valid mark that is entitled to protection under the Lanham Act; and (2) that Best Shot's use of the mark is likely to cause confusion within the consuming public.  *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 757 (E.D. Mich. 2003) (citing *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1114 (6th Cir. 1996)).  There is no dispute that Schneider owns a valid mark.  Therefore, the only issue before the Court with respect to infringement is whether there is "a likelihood of confusion regarding the origin of the goods or services offered by the two corporations."  *Honorable Order of Ky. Colonels v. Bldg. Champions, LLC*, 345 F. Supp. 2d 716, 720 (W.D. Ky. 2004) (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997)).

Schneider has also alleged that Best Shot's Marks are counterfeit.  To establish liability for trademark counterfeiting, Schneider must first prevail on its claim for infringement and then also show that Best Shot "intentionally used the mark knowing it was a counterfeit."  *Lorillard Tobacco Co. v. Yazan's Serv. Plaza, Inc.*, No. 05-70804, 2007 U.S. Dist. LEXIS 45612, at *11 (E.D. Mich. June 25, 2007); *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.*, 363 F. Supp. 2d 952, 957-958 (S.D. Ohio 2005) (citations omitted).  A counterfeit mark is a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.  Counterfeiting is sometimes refereed to as "first degree" infringement – it "is the most blatant and egregious form of 'passing off.'"  4 J.T. McCarthy, Trademarks and Unfair Competition § 25:10 (2009).

5

## A.  Likelihood of Confusion

In this case, the "likelihood of confusion" is the sole question at issue with respect to infringement, which, in turn, is the threshold question with respect to counterfeiting.  Many courts have noted that "[w]hether a likelihood of confusion exists is inherently a factual issue," which generally makes it a determination that is inappropriate for summary judgment.  *E.g., Am. Mensa, Ltd. v. Inpharmatica, Ltd.*, No. 07-3283, 2008 U.S. Dist. LEXIS 99394, at *9-10 (D. Md. Nov. 6, 2008) (citation omitted); *see also GMC v. Keystone Auto. Indus.*, 453 F.3d 351, 359 (6th Cir. 2006) ("[T]rial courts disfavor deciding trademark cases in summary judgments because the ultimate issue is so inherently factual.") (citation omitted); *Whirlpool Props. v. LG Elecs. U.S.A.*, No. 1:03-CV-414, 2005 U.S. Dist. LEXIS 30311, at *41 (W.D. Mich. Nov. 17, 2005) ([Generally,] the existence of likelihood of confusion frames a factual question for the jury's determination.).  Courts in this district are no exception.  *See Vistein v. Am. Registry of Radiologic Technologists,* 509 F. Supp. 2d 666, 703 (N.D. Ohio 2007) (*adopted* at 509 F. Supp. 2d 666); *ETW Corp. v. Jireh Publ'g, Inc.*, 99 F. Supp. 2d 829, 830 (N.D. Ohio 2000).  A district court should only grant summary judgment in a trademark case when all reasonable jurors would conclude that the defendant's mark is likely to cause confusion in the minds of consumers.  *See Basketball Mktg. Co. v. Upscale Entm't & Mktg. Group*, 227 Fed. Appx. 492, 493 (6th Cir. 2007); *Future Lawn, Inc. v. Maumee Bay Landscape Contrs., L.L.C.*, 542 F. Supp. 2d 769, 776 (N.D. Ohio 2008).

The parties agree that whether a mark is likely to cause confusion depends on eight factors that are commonly known as the "*Frisch* factors."  These eight factors are the: (1) strength of the mark; (2) similarity of the marks; (3) relatedness of the goods or services; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care;

(7) intent of the junior party in selecting the mark; and (8) likelihood of expansion of the product lines.  *See Frisch's Rests., Inc. v. Elby's Big Boy, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982); *Vistein*, 509 F. Supp. 2d at 703 ("In determining whether a likelihood of confusion exists, courts consider eight factors set forth in *Frisch's Restaurants v. Elby's Big Boy*.").  Not every factor will be relevant in every case, and the parties agree that the eighth factor is not relevant here. *See Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1997).[5]  The *Frisch* factors aide a court in determining whether the typical consumer is likely to believe that the parties are affiliated.  *See id*.  Consequently, the application of the *Frisch* factors is not a ridged mathematical formula; rather, they should be understood as a "totality of the circumstances" test with respect to the likelihood of consumer confusion.  *See id*. ("These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely.").

### B.  Whether a Mark is Counterfeit

Even if a mark is infringing, that mark is not necessarily counterfeit, because, while "[c]ounterfeiting is a subset of trademark infringement [and] [a]ll counterfeits infringe … not all infringements are counterfeit."  2-5 Gilson on Trademarks § 5.19 (2008).  Infringement, therefore, is merely one prerequisite to a finding of a counterfeit mark. *Too, Inc. v. TJX Cos.*, 229 F. Supp. 2d 825, 837 (S.D. Ohio 2002).  Counterfeiting is "the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark."  *Id*. (citation omitted).  A mark will only be considered

---

[5] So, too, the *Frisch* factors are non-exhaustive.  Where, as here, parties agree that they form the basis for the relevant inquiry, it is unnecessary for a Court to consider what other factors might be relevant.

counterfeit when it is "identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

While infringement may well create confusion in the minds of consumers, counterfeiting is the "passing off" of the infringing mark as the registered mark. *See Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 142 (4th Cir. 1998); *Unique Concepts v. Manuel*, No. 85-C-4181, 1986 U.S. Dist. LEXIS 22765, at *49 (N.D. Ill. July 15, 1986); 4 J.T. McCarthy § 25:10 (2009).  For this reason, when determining whether a mark is counterfeit, courts generally consider whether consumers would find the infringing mark "identical with, or substantially indistinguishable from" a registered mark as it appears in the marketplace, rather than how two marks may appear in the abstract.  *GTFM, Inc. v. Solid Clothing, Inc.*, No. 01-Civ.-2629, 2002 U.S. Dist. LEXIS 15422, at *6-7 (S.D.N.Y. Aug. 21, 2002) ("There is nothing in the Act, however, which states that to determine whether a defendant is engaged in counterfeiting, one compares plaintiff's and defendant's marks in the abstract, without considering how they appear to consumers in the marketplace."); *see also Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp.*, 486 F. Supp. 2d 286, 289 (S.D.N.Y. 2007) ("[A]n allegedly counterfeit mark must be compared with the registered mark as it appears on actual merchandise to an average purchaser.") (citation omitted); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 464 F. Supp. 2d 495, 506 (E.D. Va. 2006) (same).[6]  This is a high bar, because slight differences, so long as they are apparent to the

---

[6] The Lanham Act contains no express requirement that a court consider marks as they appear to consumers.  Indeed, a plain reading of this language would indicate that a court should, as Schneider argues, use the registered mark as the basis of comparison.  Yet, courts consider actual marks because "[i]t seems safe to assume that counterfeiters copy actual merchandise, not registration certificates."  *Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 532 (2d Cir. 1983).  Of course, *Montres Rolex* explicitly noted that a registration certificate could be used if actual merchandise was unavailable. *See id*.

At least some courts seem to have taken *Montres Rolex* as an invitation to blend claims of an infringing trademark with claims of an infringing trade dress.  It is, in fact, not always clear

typical consumer upon minimal inspection, will defeat the allegation that a mark is counterfeit. *See, e.g.*, *Colgate-Palmolive*, 486 F.Supp.2d at 289 (holding that "Colddate Toothpaste" is not a counterfeit of "Colgate Toothpaste," despite exceedingly similar packaging); *Bacardi & Co. v. New York Lighter Co.*, No. 97-CV-7140, 2000 U.S. Dist. LEXIS 19852, at *4 (E.D.N.Y. Sept. 5, 2000) (finding that "BACARBI lighters" were not a counterfeit use of "BACARDI"); *cf. Montres Rolex, S.A. v. Snyder,* 718 F.2d 524, 526 (2d Cir. 1983) (finding that imported bracelets were counterfeit where a jeweler's magnifying loupe was required to discern any difference between the products).  Indeed, even Schneider appears to concede that when marks differ from each other by a mere two letters, the mark will not usually be considered counterfeit.  (*See* Doc. 82 at 17.)  Summarizing the case law and commentary, it appears that the appropriate test for

---

whether courts are analyzing a trademark or trade dress claim.  *See, e.g.*, *Colgate-Palmolive*, 486 F. Supp. 2d at 289 (noting that the plaintiff is the owner of both registered trademarks and related trade dress, discussing only whether a "mark" was counterfeit, but conducting an extensive analysis of the packaging on which the mark appeared); *see also* 4 McCarthy 8:1 ("The reason for making a semantic distinction between "trademarks" and "trade dress" is largely historical…. the history of American law throughout much of the Twentieth Century is the gradual disappearance of distinctions between the law of 'trade dress' and that of 'trademarks.'").

    This Court believes that, if given the opportunity, the Sixth Circuit would explicitly distinguish trademark counterfeiting claims from trade dress claims to the extent that the former properly focuses on the mark itself, whereas the latter involves a broader inquiry.  Having said that, however, the Court believes that the fundamental principle behind *Montres Rolex* still holds: the question is whether a consumer would believe that the infringing mark is the registered mark, a determination typically based upon how the registered mark appears in the marketplace.  Indeed, anomalous results would be possible using registration certificates or another abstract basis for comparison, as a mark that was close to the line for infringement based on the real-world test required for likelihood of confusion might appear obviously counterfeit, a result contrary to the statutory scheme.  *See, e.g.*, *Diane Von Furstenberg Studio v. Snyder*, 1:06cv1356, 2007 U.S. Dist. LEXIS 45941, at *6 (E.D. Va. June 25, 2007) ("Congress intended to construe counterfeiting as a subset of infringement."); *Pepe, Ltd. v. Ocean View Factory Outlet Corp.*, 770 F. Supp. 754, 758 (D.P.R. 1991) ("[Congress did] not intend to treat as counterfeiting what would formerly have been arguable, but not clear cut, cases of trademark infringement.") (citing 130 Cong. Rec. H12078); *see also* 4 J.T. McCarthy § 25:10.

trademark counterfeiting is whether reasonable consumers would believe that the infringing mark <u>is</u> the senior mark.

## III. THE STANDARD FOR SUMMARY JUDGMENT

Parties have filed cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  (Docs. 74, 75, 76.)  Under Rule 56(c), summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

In reviewing summary judgment motions, this Court must view evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. Mich. 2008).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.  Thus, in most civil cases, the Court will decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."  *Anderson*, 398 U.S. at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008).  The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the

absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Chappell*, 584 F. Supp. 2d at 987.

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact."  *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Barr v. Lafon*, 538 F.3d 554, 574 (6th Cir. 2008).

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find

a verdict for the party producing it, upon whom the *onus* of proof is imposed.") (emphasis in original) (internal quotations omitted).

## IV. THE EVIDENCE CONSIDERED FOR PURPOSES OF THIS MOTION

Schneider has filed a Motion to Strike certain evidence on which Best Shot relies, and that motion is the subject of substantial briefing by each party.  (*See* Docs. 90, 91, 98, 101.) Schneider first asks the Court to disregard Best Shot's expert report because Best Shot initially failed to submit a page from the deposition in which this report was authenticated.  This request is **DENIED**.[7]  Schneider also asks that this Court not consider numerous unauthenticated photographs submitted by Best Shot, a request that is **GRANTED IN PART**.

### A.  The James Berger Expert Report is Admissible Evidence

Schneider suggests that this Court should ignore the expert report of James Berger ("Berger Report") (Doc. 84 Ex. G) because it was not properly authenticated (Doc. 90 at 7).[8]  In Best Shot's initial briefing (Docs. 74, 75, 84, 86), Best Shot made numerous references to the Berger Report, but at no point included the page from the Berger Deposition in which Berger actually authenticated that report.  Best Shot, however, ultimately cured this omission.  (*See* Doc. 91 Ex. C (containing the page from the Berger Deposition in which Berger authenticated his report).)

---

[7] Schneider's Motion is also wholly **DENIED** to the extent that it requests that evidence literally be stricken from the Record.

[8] In Schneider's Reply Brief on its Motion for Partial Summary Judgment, Schneider also asserts that the Berger report, if challenged, would not comport with Rule 702 of the Federal Rules of Evidence.  (*See* Doc. 89 at 21.)  There is no *motion in liminie* or other motion to exclude the Berger report on this ground, however, nor was this ground raised in Schneider's Motion to Strike.  The report is thus considered uncontested, because it would not be proper to exclude the report on the basis of a reply brief that merely suggests that the report might well be inadmissible were a proper motion filed.

The Court will accept this belated authentication.  A reviewing court should not ignore evidence on summary judgment that would unquestionably be admissible before a jury.  *See Eastham v. Sprickman*, No. C05-141Z, 2006 U.S. Dist. LEXIS 22626, at *4-5 (W.D. Wash. Mar. 30, 2006) ("Plaintiff's sur-reply includes a declaration by [the expert] that authenticates his expert report…. The Court [denies] Defendants' motion to strike the [initially unauthenticated] expert report."); *Strock v. USA Cycling, Inc.*, No. 00-cv-2285, 2005 U.S. Dist. LEXIS 41840, at *22 (D. Colo. May 8, 2005) ("[Plaintiff] failed to file [the expert's] authenticating affidavit until well after the pleadings surrounding summary judgment and the motions to strike in his case had been submitted…. [However] I consider the [expert] reports authenticated for purposes of evaluating whether a genuine issue exists.") (citations omitted); *accord Mont. v. Egelhoff*, 518 U.S. 37, 67 (1996) (O'Connor, J., dissenting) ("The purpose of the familiar evidentiary rules is … [to] vindicate some … goal or value – e.g., to ensure the reliability and competency of evidence.").  As no evidentiary principle would be vindicated by the contrary result, this Court will consider the Berger Report.

**B.  The Unauthenticated Photographs are Partially Admissible**

Best Shot has attached a number of unauthenticated photographs to its motions, most of which are printed directly from the parties' web-sites.  (*See*, *e.g.*, Doc. 74 Ex. I.)  Courts are usually hesitant to accept any unauthenticated material for purposes of summary judgment, but here, the images of Best Shot's and Schneider's products are admissible.  In a trademark dispute, a court may choose to take judicial notice of the very images that are the subject of the dispute, so long as there is no contention by either party that the images are inaccurate or could not be properly admitted before a jury.  *See Comedy III Prods., Inc. v. New Line Cinema*, 200 F.3d 593, 594 (9th Cir. 2000) ("[T]he district court took judicial notice of the motion picture's contents.");

*cf. Thomas v. Walt Disney Co.*, No. C-07-4392, 2008 U.S. Dist. LEXIS 14643, at *5 (N.D. Cal. Feb. 14, 2008)  ("[T]he Court grants Defendants' request for judicial notice of the text of 'Squisher the Fish' and the motion picture 'Finding Nemo'.").  This is particularly true, where, as here, the images are printed from the parties' own web-sites.  *See* FED. R. EVID. 201(b)(2) ("A judicially noticed fact must be one not subject to reasonable dispute that is … capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *cf. Horizon Healthcare Servs. v. Allied Nat'l, Inc.*, No. 03-4098, 2006 U.S. Dist. LEXIS 5440, at *30 (D.N.J. Feb. 10, 2006) ("This Court takes judicial notice of the fact that [Defendant] continues this registration symbol misuse on its website to this day.").  The Court takes judicial notice of the images of these products, because there is no dispute that the images of Schneider's and Best Shot's products are accurate depictions of the usage of the Schneider Marks and Best Shot Marks.  (*See* Docs. 106, 107 (containing fully authenticated images of Schneider's and Best Shot's products bearing the marks in question, which were submitted after briefing on summary judgment and related motions concluded).); *accord Strock*, 2005 U.S. Dist. LEXIS 41840, at *22 ("I can ascertain no prejudice [by admitting belatedly authenticated evidence] in light of the overarching policy favoring trial where genuine issues of material fact exist.").[9]

Conversely, the other images on the web-pages provided by Schneider fall under no such exception.  *See Nightlight Sys. v. Nitelites Franchise Sys.*, No. 1:04-CV-211, 2007 U.S. Dist.

---

[9] So, too, it would be a needless waste of resources for all parties and the Court to deny summary judgment, only to then grant a motion for a directed verdict when critical disregarded evidence was ultimately authenticated.

The principle under which the Court is considering this evidence, of course, must be limited to situations such as the above where there is no genuine dispute about the authenticity of the proffered materials and there is no genuine question that the materials considered by the Court would be properly admissible before a jury.

LEXIS 95538, at *16 (N.D. Ga. May 11, 2007) ("[T]o authenticate a printout from a web page, the proponent must present evidence from a percipient witness stating that the printout accurately reflects the content of the page and the image of the page on the computer at which the printout was made."); *cf. Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 561 (D. Md. 2007) ("Photographs have been authenticated for decades under Rule 901(b)(1) by the testimony of a witness familiar with the scene depicted in the photograph who testifies that the photograph fairly and accurately represents the scene.").[10]  Similarly, Best Shot attached unauthenticated photographs of an unknown origin depicting images such as toothpaste, popcorn, and other equine-care products.  (*See, e.g.*, Doc. 86 at 7.)  These images must also be disregarded.  *See Magnum Towing & Recovery v. City of Toledo*, 287 Fed. Appx. 442, 448 (6th Cir. 2008) ("[The district] court properly did not consider any documents … that were unauthenticated or otherwise failed to meet the requirements of Rule 56(e) of the Federal Rules of Civil Procedure.") (citations omitted); *see also Lorraine*, 241 F.R.D. at 561.

It might well be preferable to require parties to assert a good-faith belief that proffered evidence was inauthentic as a predicate to challenging its authentication.  This is not, however, the evidentiary rule.  Consequently, the Court declines to take notice of the images attached to Best Shot's briefing, except with respect to the images depicting the use of the very marks that are the subject of the instant dispute.

---

[10] The Court does, however, question the case law indicating that it is generally inappropriate to take judicial notice of the content of publically available websites for purposes of summary judgment, particularly to the extent that these cases frequently fail to distinguish between material offered for the truth of the matter asserted and material offered for the fact of its publication.

## V.  SCHNEIDER'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE QUESTION OF TRADEMARK INFRINGMENT

Schneider argues that there is no genuine issue of material fact regarding the issue of trademark infringement.  (Doc. 76.)  As previously explained, the Court must consider seven factors to evaluate the allegation of infringement, the: (1) strength of the mark; (2) similarity of the marks; (3) relatedness of the goods or services; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; and (7) intent of the junior party in selecting the mark.  *See Frisch's*, 670 F.2d at 648.  It should be understood that "[t]hese factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely."  *GMC v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006) (citations omitted).

Balancing the seven relevant factors in this case, and viewing the evidence in the light most favorable to Best Shot, it is evident that Best Shot has established the existence of genuine questions of material fact on Schneider's claim, and the question of likelihood of confusion must be submitted to the trier of fact.

### A.  The Seven Factors

#### 1.  Strength of the Senior Mark

The strength of a mark is a factual determination of the mark's distinctiveness.  *Leelanau Wine Cellars Ltd. v. Black & Red, Inc.*, 118 Fed. Appx. 942, 947 (6th Cir. 2004) (citation omitted).  A stronger mark is deemed more likely to produce confusion among buyers in a typical trademark action.  *Leelanau Wine Cellars v. Black & Red*, 502 F.3d 504, 515 (6th Cir. 2007) (citation omitted); *cf. A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 230-231 (3d Cir. 2000) (noting that a weak mark receives greater protection than a strong mark in cases alleging "reverse confusion").  Yet, even in these cases, a weak mark will still receive

some protection under the trademark laws.  *See Comerica Inc. v. Fifth Third Bankcorp*, 282 F. Supp. 2d 557, 574 (E.D. Mich. 2003).

### a.  The Significance of Incontestability

Schneider argues that its marks are strong because they are incontestable, but this "confuses the issue of a trademark's validity with the separate inquiry into a mark's strength for purposes of the likelihood of confusion determination."  *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006); *see also General Conf. Corp. of Seventh-Day Adventists v. McGill*, No. 06-1207, 2008 U.S. Dist. LEXIS 45526, at *30-31 (W.D. Tenn. June 11, 2008) (citations omitted).  For that reason, "[t]he presumption of strength arising from incontestable status does not necessarily translate into a strong mark for purposes of a likelihood of confusion analysis."  *Jimdi, Inc. v. Twin Bay Docks & Prods.*, 501 F. Supp. 2d 993, 1003 (W.D. Mich. 2007) (citing *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623 (6th Cir. 2002)).[11]   A reviewing tribunal must evaluate "the ultimate issue of whether confusion is likely to occur."  *Therma-Scan*, 295 F.3d at 632.  Indeed:

> Even where a trademark is incontestable and worthy of full protection, the significance of its presumed strength will depend upon its recognition among members of the public.   Treating a valid, incontestable trademark as an exceptionally strong mark for the purpose of determining whether confusion is

---

[11] There appears to be a slight, but potentially significant, difference in the way in which Courts view the relationship between the presumption of strength that derives from incontestability and the *Frisch* factors.  Some courts seem to treat the presumption of strength that derives from incontestability as wholly separate from the strength that a court must evaluate when balancing the *Frisch* factors, whereas other courts treat incontestability as creating a rebuttable presumption of strength for purposes of the *Frisch* factors.  *Compare Seventh-Day Adventists,* 2008 U.S. Dist. LEXIS 45526, at *30-31 *with Jimdi,* 501 F. Supp. 2d at 1003.

Those asserting that the analysis should be wholly separate make the more compelling argument: there is no apparent reason that the incontestable status of a mark should automatically translate into a well-known mark and, accordingly, although the Sixth Circuit has never squarely addressed this issue, the Court believes that the Sixth Circuit would adopt the reasoning of the Fourth Circuit and so hold.  *See CareFirst*, 434 F.3d at 269.

likely to occur, without examining whether the mark is distinctive and well-known in the general population, would shift the focus away from the key question of whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.  Although a trademark may be strong and worthy of full protection because it is valid and incontestable, that does not necessarily mean that its strength is particularly relevant to the ultimate issue of whether confusion is likely to occur.

*Id*. (citations omitted).[12]

### b.  The Berger Report

Best Shot argues that its expert can establish that Schneider's mark is weak.  Indeed, their expert asserts that his survey "conclusively proves that ULTRA with respect to equine products is a weak trademark."  (Doc. 84 Ex. 7 at 11.)  This is strong and currently uncontroverted evidence, as a reasonable jury may properly credit a customer survey as conclusive evidence that a mark is not widely known.  *See Powerhouse Marks*, 2006 U.S. Dist. LEXIS 16454, at *6 (citation omitted); *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d

---

[12] As an initial step in determining a mark's strength, a court should ordinarily classify a mark as generic, descriptive, suggestive, or fanciful.  *See Sprinklets Water Center, Inc. v. McKesson Corp.*, 806 F.Supp. 656, 661 (E.D. Mich.,1992) (citing *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 361 (6th Cir.1984)).  A generic mark is one which is commonly used as the name or description of a kind of goods or services. Such a mark is afforded no protection and is considered very weak.  *Induct-O-Matic*, 747 F.2d at 362-63.  A descriptive mark, on the other hand, specifically describes a characteristic or ingredient of an article or service and, though not ordinarily protected, may become protectable if it acquires secondary meaning.  *Id*.  A suggestive mark suggests rather than describes a characteristic of the goods or services, and requires an effort of the imagination by the consumer in order to be understood as descriptive.  *Id*.  A suggestive mark requires no proof of secondary meaning to receive protection.  *Id*.  Finally, an arbitrary or fanciful mark enjoys the same full protection as a suggestive mark, but is far enough removed from the descriptive not to be vulnerable to possible attack.  *Id*.  In this case, however, while Schneider's mark appears, on initial inspection, to be descriptive, there is no question that it is protected.  *See Park 'n Fly v. Dollar Park & Fly*, 469 U.S. 189, 196 (1985) ("Mere descriptiveness is not … a basis for challenging an incontestable mark.").  This Court, accordingly, need not classify Schneider's Marks.

680, 693 (E.D. Va. 2005).[13]  Indeed, a customer survey may frequently be the best evidence that a litigant could present on the issue of a mark's strength.  *cf. Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 284 (3d Cir. 2001) ("[Plaintiff] did not present any evidence of a customer survey indicating [its] marks' strength, and thus there is no direct evidence probative of customer views.").

### c.  Third-Party Use of "Ultra"

Best Shot also argues that the Schneider Marks are weak because there is extensive third-party usage of the term "ultra."  Best Shot is correct that "[t]hird-party usage of a trademark may weaken a mark, even if the mark is used with respect to different kinds of goods."  *Aero-Motive Co. v. U.S. Aeromotive*, 922 F. Supp. 29, 38 (W.D. Mich. 1996) (citing *Homeowners*, 931 F.2d at 1108 (citation omitted)).  It is also true, however, that "merely showing the existence of marks in the records of the Patent and Trademark Office will not materially affect the distinctiveness of another's mark…. In order to be accorded weight a defendant must show what actually happens in the marketplace."  *Daddy's Junky*, 109 F.3d at 281.  Here, because Best Shot has merely noted the existence of numerous other registrations for "ultra" and asserted that 7 of these registrations are related to shampoo, conditioner, and coat finisher in the equestrian field (Doc. 76 at Ex. 2), the Court finds that this cannot be accorded persuasive value.  *See Daddy's Junky*, 109 F.3d at 281.[14]

---

[13] The *Powerhouse Marks* court rejected the survey conducted by the expert that Best Shot offers in this case.  This survey does not contain all of the flaws of the *Powerhouse Marks* survey and, Schneider has not provided the Court with sufficient reason to exclude this report on evidentiary grounds.

[14] Best Shot offers numerous other assertions of extensive third-party use, including the potentially highly relevant contention that Schneider's own website contains images of non-Schneider products branded "ultra," but, as previously discussed, these assertions are not supported by admissible evidence.

> ### d. The Evidence Indicates that the Schneider Marks Could be Considered Weak

Schneider counters that, notwithstanding Best Shot's expert report, Schneider's mark should be considered strong because Schneider has used the mark for 23 years, spent considerable money on promotion, and believes that purchasers of horse grooming products associate the mark strongly with Schneider.  (Doc. 20.)  While Schneider could use this evidence, perhaps combined with its own expert testimony (not currently before the Court), to persuade a fact-finder that the Schneider Marks are strong, at present, the uncontroverted survey evidence indicates otherwise.  Best Shot, therefore, has established that a reasonable jury might not consider the Schneider Marks to be strong.

> ### 2. Relatedness of the Goods or Services

The likelihood of consumer confusion is increased "if the parties compete directly by offering [related] goods or services."  *Audi AG v. D'Amato*, 469 F.3d 534, 543 (6th Cir. 2006) (citation omitted).  Here, because the products at issue perform the same function, there can be no serious contention that the products at issue are not related.  This weighs heavily in favor of finding a likelihood of confusion.[15]

---

Best Shot also references Schneider's 30(b)(6) deposition.  Best Shot does not, however, attach the relevant pages from that deposition.  Even if it had, the Court would have been hard-pressed to consider it – Best Shot cites well over 100 pages of deposition transcript.

[15] Best Shot argues that the marks overlap in only a limited fashion because both Schneider and Best Shot make other products that are not at issue here.  Although there are circumstances where a limited overlap between marks will be relevant and, indeed, limited overlap might well be relevant to a fact-finder weighing other *Frisch* factors, it is not relevant under this factor in this case, because the issue presented by this motion is Best Shot's attempt to use marks including the word "ultra" on its horse shampoo, conditioner, and finisher.  For purposes of this motion, Schneider does not contend that Best Shot may never use the "ultra" mark; just that Best Shot cannot use the "ultra" mark in this market.  Similarly, Best Shot is incorrect to argue the relevance of Schneider's other products.  One is not permitted to infringe

Schneider is not, however, correct when it asserts that a likelihood of confusion should be presumed from this alone.  Rather, the better cases relying on such a presumption require both: 1) identical use; and 2) clear intention by the user of the junior mark to derive benefit from the senior mark.  *See, e.g.*, *General Motors Corp. v. Autovation Technologies, Inc.*, 317 F. Supp. 2d 756, 761 (E.D. Mich. 2004) ("[M]ulti-factored balancing is unnecessary in cases like this one where the defendant has misappropriated precise counterfeits of the plaintiff's trademarks on goods that compete with the trademark holder's own goods.") (citations omitted); *see also Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1242 (6th Cir. 1991) ("Intent of [a party] in adopting [another's mark] is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff,] that fact alone may be sufficient to justify the inference that there is confusing similarity.").[16]

The Court does not presume infringement simply because the goods serve identical markets.  Nevertheless, there is a substantially increased likelihood of confusion because these goods are identical, particularly because as addressed below, there is also similarity between the relevant marks.  *First Am. Mktg. Corp. v. Canella*, No. 03-CV-812, 2004 U.S. Dist. LEXIS 2251,

---

on the mark of another simply because one is only infringing in connection with a limited subset of the other's products.

[16] One case cited to the Court, although frequently cited in another context, appears to contain a misstatement of law.  *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979) ("When the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected. When the goods are related, but not competitive, several other factors are added to the calculus.").  This is incorrect: assuming a protectable mark, the Court's very inquiry is whether confusion should be expected and infringement will be found if the Court so concludes.  *See, e.g.*, *Champions Golf Club*, 78 F.3d at 1114; *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1359 (9th Cir. 1985).

at *16 (E.D. Pa. Jan. 26, 2004) ("[s]imilarity between marks <u>and</u> the goods marketed usually merits a presumption of a 'likelihood of confusion.'") (citation omitted) (emphasis added).[17]

### 3.  Similarity of the Marks

Highly similar marks are, of course, more likely to be confusing to consumers than less similar marks.  In determining the similarity of marks, however, "the test is not a side-by-side look in the courtroom."  *Citizens Banking*, 2008 U.S. Dist. LEXIS 36800, at *22 (citing *Daddy's Junky*, 109 F.3d at 283); *see also D. J. Bielzoff Products Co. v. White Horse Distillers, Ltd.*, 27 C.C.P.A. 722, 724 (1939); *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 376 (S.D.N.Y. 2008).   The inquiry, rather, is "whether the marks are potentially confusing when viewed individually or 'singly' by consumers, that is, without an opportunity to compare to the competing mark."  *Citizens Banking*, 2008 U.S. Dist. LEXIS 36800, at *23.  Even though two marks may be readily distinguishable when placed side by side, they "may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark."  *Daddy's Junky*, 109 F.3d at 283.  When examining this factor "marks must be considered in their entirety and as they appear in the marketplace."  *Nautilus Group, Inc. v. Icon Health & Fitness, Inc.*, 372 F.3d 1330, 1345 (Fed. Cir. 2004).

---

[17] Even this principle articulated in *First American*, while undoubtedly correct, may obscure a larger truth.  When a court is evaluating a claim for trademark infringement, there are no ridged rules that will enable a court to find likelihood of confusion – each case is necessarily somewhat different.  It is, indeed, the nature of a  predominantly factual inquiry and the reason that summary judgment is so rare on the question of trademark infringement.

### a.  Factors Considered to Determine Similarity

#### 1.  Standing Alone, the Addition of a Single Word Does Not Render These Marks Dissimilar

Best Shot asserts that the presence of an additional word ("plenish," "vitalizing mist," or "wash") operates to render these marks dissimilar.  In general, the presence of a single word can, indeed, have just this effect.  *See Entrepreneur Media v. Smith*, 279 F.3d 1135, 1145 (9th Cir. Cal. 2002) ("A reasonable juror could, in this context, find 'Entrepreneur' and 'Entrepreneur Illustrated' dissimilar.").  This is particularly true where the mark is "weak" and consists of only a "common laudatory term."  *Qwest Communs. Int'l v. Cyber-Quest, Inc.*, 124 F. Supp. 2d 297, 305 (M.D. Pa. 2000) (citations omitted).

Context, however, is critical to all of these cases.  As an initial matter, it is unlikely that the addition of a single word could render two marks dissimilar when the marks still carry "the same overall connotation."  *In re Nat'l Data Corp.*, 753 F.2d 1056, 1060 (Fed. Cir. 1985);[18] *see also Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358 (6th Cir. 1984) (finding INDUCTO and INDUCT-O-MATIC confusingly similar); *Yellowbrix, Inc. v. Yellowbrick Sol., Inc.*, 181 F. Supp. 2d 575, 578 (E.D.N.C. 2001) ("the similarity of 'Yellowbrix' and 'YellowBrick Solutions' is readily apparent.").  The addition of one word will be particularly unlikely to distinguish a mark when that word simply identifies the product being marketed.  *See A.C. Legg Packing Co. v. Olde Plantation Spice Co.*, 61 F. Supp. 2d 426, 430-431 (D. Md. 1999) ("The addition of the word 'spice' to OPSC's mark does not detract from the similarity between the marks, particularly since the word simply identifies the goods sold by both parties.").  Where,

---

[18] The Federal Circuit was considering two marks that carried the same connotation in the abstract, whereas the marks here only carry the same  connotation as used in the marketplace – e.g., "'ULTRA' horse shampoo" vs. "'ULTRAWASH' horse shampoo."  The same principle applies, however, because the overall test is one for likelihood of consumer confusion.

as here, "the general impression conveyed by the two marks is the same," *Rosenthal A.G. v. Rite Lite*, 986 F. Supp. 133, 143 (E.D.N.Y. 1997), Best Shot cannot establish a genuine issue of material fact merely because its marks carry an additional word.[19]

### 2. Jurors Might Find that the Inclusion of "Best Shot" Makes Confusion Less Likely

Best Shot argues that the prominent inclusion of its company's name makes customer confusion less likely.  Schneider, in turn, asserts that the inclusion of the company's name makes confusion <u>more</u> likely.  Both cite case law on this issue.  *Compare AutoZone, Inc.,* 373 F.3d at 797 ("The use of a challenged junior mark together with [the company's name] can distinguish the challenged junior mark from the senior mark and make confusion less likely.") *with Menendez v. Holt*, 128 U.S. 514, 521 (1888) ([The use of the company's name is] aggravation and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor."); *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972) ("[A] purchaser could well think plaintiff had licensed defendant as a second user.").  Were the Court the finder of fact, it would be persuaded by Schneider's reasoning in cases where, as here, the products in question serve identical functions.  A reasonable jury, however, might disagree with the Court's conclusion in this regard.

### b. Best Shot has Established an Issue of Material Fact on this Factor

Were the Court the ultimate finder of fact, the similarity of the logos would weigh in Schneider's favor.  Indeed, viewing the trademarks as they appear in the marketplace (Docs. 106,

---

[19] Both Best Shot and Schneider devote briefing to the issue of whether "Ultra" or "Wash/Plenish/Vitalizing Mist" is the descriptive word in Best Shot's marks, citing the general principle that the addition of a descriptive mark cannot save an otherwise infringing use.  On these facts, however, where Schneider's mark is the single word "Ultra," the Court does not consider this analysis pertinent.  *See Daddy's Junky*, 109 F.3d at 283.

107), it seems that Best Shot will face an extremely steep challenge at trial on the question of similarity.[20]   This notwithstanding, the prominent inclusion of Best Shot's corporate logo combined with the addition of new words to the trademark does create a genuine issue of fact for the jury.

### 4.  Evidence of Actual Confusion

While actual confusion is presumptive evidence that consumers are "likely" to be confused by two marks, the parties agree that there is no evidence of actual confusion.[21] Absence of confusion is not considered nearly as persuasive as its presence.  *See Ewald v. DaimlerChrysler Corp.*, 2002 U.S. Dist. LEXIS 16648, at *5 (N.D. Ohio) ("While actual confusion is the best evidence to support a [finding that there is a] likelihood of confusion, it is not necessary to demonstrate infringement.") (citing *Therma-Scan*, 295 F.3d at 634).  Indeed, it has been said that actual confusion "is weighed heavily <u>only</u> when such evidence exists." *GMC v. Keystone Auto. Indus.*, 453 F.3d 351, 356-57 (6th Cir.) (6th Cir. 2006) (citing *Daddy's Junky*, 109 F.3d at 284) (emphasis added).[22]   Still, while not deserving substantial weight on a motion

---

[20] The Court is mindful, of course, that "[t]he legal question is not whether the marks look similar to [a reviewing tribunal], but whether they look similar to the ordinary consumers." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1136 (9th Cir. 2006); *Navistar Int'l Transp. Corp. v. Freightliner Corp.*, No. 96 C 6922, 1998 U.S. Dist. LEXIS 20284, at *14 (N.D. Ill. Dec. 21, 1998).

[21] The presence of substantial actual confusion would frequently, in and of itself, merit a finding of a likelihood of confusion.  This would not always be so, however, because actual confusion could, of course, be caused by some other variable.

[22] Were the Court free to make such a determination, it might reach a different conclusion – that "[t]he absence of substantial actual confusion ... will often by itself answer the question as to whether there is a likelihood of confusion between the two marks at issue."  *Ciphertrust, Inc. v. Trusecure Corp.*, No. 1:04cv1232, 2005 U.S. Dist. LEXIS 46322, at *46 (E.D. Va. Nov. 28, 2005) (citations omitted); *see also Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F.Supp.2d 815 (N.D. Ill. 1999); *Ohio Art Co. v. Lewis Galoob Toys, Inc.*, 799 F.Supp. 870, 884 (N.D. Ill. 1992).  If consumers are exposed to substantial marketing efforts from both

for summary judgment, the absence of any actual consumer confusion is a factor that a jury would consider in Best Shot's favor.

This is particularly so because there is some evidence on the record that arguably supports the inference that consumers likely have <u>not</u> been confused by these marks.  Schneider points out that consumers generally do not permit unauthorized products to be used on their horses; apparently, consumers "constantly" return products because the person who bought a product mistakenly purchased the incorrect one.  (Doc. 75 Ex. F at 89-90.)  It seems that if consumers had been confused, some record of this confusion should exist.  The Sixth Circuit instructs, however, that the Court may not give overwhelming weight to this factor.

### 5.  Marketing Channels Used

Marks distributed to consumers through similar marketing channels will frequently be more likely to cause confusion than marks that consumers encounter in fundamentally different environments.  In weighing this factor, courts consider not only "whether the marketing approaches employed by each party resemble each other," but also "the similarities or differences between the predominant customers of the parties' respective goods."  *Daddy's Junky*, 109 F.3d at 285.

Both parties advertise and sell products through the Internet and in catalogs.  And there is no dispute on this record that the predominate customers of the parties' goods are the same.  Schneider is also correct to point to the portion of Best Shot's brief arguing actual confusion, in which Best Shot adopts Schneider's statements that the parties have "extensively marketed their

---

companies, yet no evidence shows that any consumers have actually been confused, there is substantially less likelihood that consumers do or will find the marks confusing.

The problem for Best Shot, however, is that binding precedent in this Circuit is to the contrary.  Even were the Sixth Circuit to adopt this reasoning, moreover, it would not alter the ultimate conclusion in this particular case, where both parties have a fairly small market share and there is no evidence of extensive marketing to a singular population of consumers.

products in commerce in similar arenas," and that "both parties have sold their products at similar, and oftentimes the same, horse shows, in the same catalogs, and on the Internet." (Doc. 84 at 14.) There is only record evidence, however, that the parties sell through a single common catalogue. (*See* Doc. 77 at ¶¶ 9-10.) There is also no evidence, for example, that the same web sites carry both companies' products or that consumers are likely to be confused by the parties' respective web-sites. *But see Seven Elephants Distrib. Corp. v. Earthquake Sound Corp.*, No. CV 06-4761, 2007 U.S. Dist. LEXIS 28076, at *14 (C.D. Cal. Jan. 11, 2007) ("The fact that both parties use the internet as a substantial marketing channel exacerbates the likelihood that buyers intending to find one company's products will inadvertently purchase the other's.").[23] While a reasonable jury could easily conclude that this factor favors Schneider, viewing the evidence in the light most favorable to Best Shot, that jury might also decline to award this factor substantial weight.

### 6. Likely Degree of Purchaser Care

When purchasers exercise a high degree of care, they are less likely to be confused by relatively similar marks. Schneider, however, has provided sworn testimony that customers and prospective customers of horse grooming products exercise relatively little care. (Doc. 77 at ¶ 10.)[24] Best Shot appears to concede this, but suggests that, because the actual purchasers of horse grooming products are not the end users of such products and the end users of such

---

[23] Because the parties agree that the Internet is a common marketing channel, there is no need to conduct a separate analysis to determine if the Internet should be considered such a channel. *Cf. Honorable Order of Ky. Colonels v. Bldg. Champions*, LLC, 345 F. Supp. 2d 716, 723 (W.D. Ky. 2004) (discussing the three-part test employed to make this determination).

[24] Absent evidence to the contrary courts employ "a 'typical buyer exercising ordinary caution' standard." *Leelanau Wine Cellars*, 502 F.3d at 520 (quoting *Daddy's Junky*, 109 F.3d at 285).

products <u>do</u> exercise substantial care, this factor should be weighed in favor of Best Shot.  Best Shot is mistaken.

Were the Court to adopt Best Shot's proposed interpretation of this factor, the focus of the inquiry would shift from the purchaser to the end-user.  Although the damages may certainly be less if the ultimate end-users are unlikely to be confused, the Court may not simply discount the purchaser.  *See Mid-State Aftermarket Body Parts v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006) ("Confusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner.").  Indeed, it is clear that the value of a trademark is surely diminished if another product is likely to be purchased in its place accidentally, even if such accidental purchases may frequently be returned.  End-users might, for example, stop requesting a particular product if purchasers began bringing back the wrong product when the end-user requested it, or, end-users could decide to try the new product and decide that they liked the new product better.  There is simply no basis upon which this Court could ignore purchaser care.  *See id*.

Best Shot also argues that customers use a high degree of care in purchasing horse grooming products because, although the grooming products themselves are inexpensive, the horses upon which they are used are expensive.  (Doc. 84 at 17.)  Best Shot, however, offers no basis for its conclusion that "a customer is not likely to spend thousands of dollars on a horse and then just use any old shampoo and conditioner."  (*Id*.)  Indeed, as Schneider colorfully analogies, the owner of an expensive car may well use the same car wash as the owner of inexpensive cars.  The issue is not whether the horse is expensive, but whether consumers are likely to exercise an unusual degree of care prior to purchasing grooming products for that horse.  *Daddy's Junky*,

109 F.3d at 285 ("when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases.").[25]

There is unrefuted testimony that the actual purchasers of equine care products exercise relatively little care prior to making a purchasing determination.  (Doc. 77 at ¶ 10.)  This factor, thus, weighs in favor of finding a likelihood of confusion.

### 7.  The Intent of Defendant in Selecting the Mark

Intent is relevant because, if a party intended to infringe, a fact-finder may well assume that the party was successful in doing so. *See Leelanau Wine*, 502 F.3d at 520.  Indeed, when "a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Group*, 931 F.2d at 1111.  It is an asymmetrical factor, because it would be only the most unusual circumstances in which a defendant's good faith could be evidence that a mark does not confuse consumers.  *See Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1189 (6th Cir. 1988).

Schneider argues that, because Best Shot knew of the Schneider marks and did not disclose them to the PTO, intentional infringement can be inferred.[26]  Best Shot, however,

---

[25] Moreover, as explained by the court in *Daddy's Junky*, where marks are similar, the degree of purchaser care becomes less relevant.  *Id*. at 286.  The court held that:

> The effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue…. That is, confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party.

*Id*.  Since the marks in this case are quite similar, the degree of purchaser care is a less-significant factor in the likelihood of confusion analysis.  Therefore, even if this factor did favor Best Shot, would not alter the underlying determination that Best Shot's marks post a high likelihood of confusion in light of the totality of the *Frisch* factors.

counters that it intended to expand its own marks into from other animal care products into the equine care market prior to learning of Schneider's existence.  (Doc. 74 Ex. A at 33.)  Drawing all reasonable inferences in favor of Best Shot, a jury could conclude, despite the evidence to which Schneider points on this issue, that Best Shot selected its trademark solely to expand on the Best Shot name.  *See Leelanau Wine Cellars*, 502 F.3d at 520.  There are, accordingly, material issues of fact with respect to best Shot's intent that prevent the Court from giving this factor the weight that Schneider asserts this Court should accord it.

### B.  Best Shot has Established the Existence of a Genuine Issue of Material Fact

Best Shot has an unquestionably difficult task before a jury.  Indeed, were this Court the ultimate finder of fact, it might well conclude that Best Shot's marks infringe on Schneider's duly registered senior marks.  The question of trademark infringement, however, is a quintessential jury issue.  *See, e.g., Vistein,* 509 F. Supp. 2d at 703; *ETW Corp.*, 99 F. Supp. 2d at 830.  On these facts, drawing all reasonable inferences in favor of Best Shot, it is clear that Best Shot has established the existence of a genuine issue of material fact.[27]  Only two of the *Frisch*

---

[26] There may be a better way to treat intent than the current practice.  It is undoubtedly true that "[c]ircumstantial evidence of copying, particularly the use of a contested mark with knowledge of the protected mark at issue, is sufficient to support an inference of intentional infringement where direct evidence is not available."  *Therma-Scan*, 295 F.3d at 638-639 (citations omitted); *see also Adjusters Int'l v. Public Adjusters Int'l*, No. 92-CV-1426, 1996 U.S. Dist. LEXIS 12604, at *19 (N.D.N.Y Aug. 27, 1996).  Within the context of the *Frisch* factors, however, this is somewhat circular – a court is to presume intent because the marks are highly similar and a court is to presume that the marks are similar enough to confuse because there is intention to create highly similar marks.  Although the ship has likely long-since left the port on this point, it might be better to consider intent within the *Frisch* factors only when there is direct proof of intentional infringement.

[27] For the same reasons that Best Shot's liability has not been established under federal law, its liability for common law trademark infringement has not been established under either Ohio common law or the Ohio Deceptive Trade Practices Act.  *See Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1431 (S.D. Ohio 1990) ("[T]he Ohio Deceptive Trade Practices Act codified the Ohio common law of trademarks.  Yet, the Act does not prevent plaintiffs from

factors point compellingly towards Schneider, and that simply is not enough given the exacting standards of summary judgment.  Schneider's Motion for Partial Summary Judgment on the Issue of Trademark Infringement is, accordingly, **DENIED**.

## VI.  CROSS-MOTIONS FOR SUMMARY JUDGMENT ON THE ISSUE OF COUNTERFEITING

As previously explained, counterfeiting is much more than infringement; it is "the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark." *Too*, 229 F. Supp. 2d at 837 (citation omitted).  A mark will only be considered counterfeit when it is "identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.  It has been noted that "[a] typical infringement case … where the parties would argue over whether consumers are likely to be confused between the two marks … does not reach the level of counterfeiting."   2-5 Gilson on Trademarks § 5.19; *accord Yurman Studio, Inc. v. Castaneda*, 591 F. Supp. 2d 471, 498 (S.D.N.Y. 2008) ("Here, however, plaintiffs argue that defendants have used counterfeit marks, making a traditional likelihood of confusion analysis unnecessary.").  Indeed, "Congress did not intend to treat as counterfeiting what would formerly have been arguable, but not clear-cut, cases of trademark infringement." *Pepe*, 770 F. Supp. at 758 (citing 130 Cong. Rec. H12078); Sandra L. Rierson, Symposium: Pharmaceutical Counterfeiting and the Puzzle of Remedies, 8 Wake Forest Intell. Prop. L.J. 433, 437-439 (2008); *see also* 4 J.T. McCarthy § 25:10 (2009).

It is true that only a very small number of courts or commentators even indirectly address the definition of "substantially indistinguishable."  *Cf.* David J. Goldstone and & Peter J. Toren, The Criminalization of Trademark Counterfeiting, 31 Conn. L. Rev. 1, 28-29 (1998) ("[N]o

---

relying on it and the common law simultaneously…. [E]lements that tend to show trademark infringement … under [the Lanham Act] … are appropriate for assessing a trademark infringement action under [Ohio law].").

reported criminal case has even needed to address the issue, presumably because the most successful counterfeiters, at whom investigatory and prosecutorial resources are directed, have achieved their 'success' precisely by using a mark substantially indistinguishable from the authentic mark.").  Nevertheless the courts that have considered this issue "have been reluctant to label a mark a counterfeit, <u>at least in the word mark context</u>, when defendant's mark is not a fairly clear copy of the registered trademark."  8 Wake Forest Intell. Prop. L.J. 433, 437-439 (emphasis added).  One court has even noted that summary judgment is usually appropriate if word marks "differ by two or more letters."  *Id.* (citing *Colgate-Palmolive*, 486 F. Supp. 2d at 289); (*see also* Doc. 82 at 13 (citing same).).

Schneider, interestingly, does not exactly argue that the marks are substantially indistinguishable.  Rather, it attempts to argue that the marks are "identical" to Schneider's. (Doc. 82 at 13 ("there is <u>no difference</u> in the letters of the marks") (emphasis in original); *id.* at 15 ("Best Shot's use of ULTRA is identical to … Schneider Saddlery's use of the exact same word mark.).  Schneider argues, in other words, that the only relevant inquiry is whether Best Shot knowingly used a mark that included the word "ultra."  (*Id.*)  Although there is, as indicated, little law in this area, that contention seems in direct contravention of the statutory scheme.  *See*  8 Wake Forest Intell. Prop. L.J. 433, 437-439 ("Congress did not intend to treat as counterfeiting what would formerly have been arguable, but not clear-cut, cases of trademark infringement.").

Against this backdrop, the Court will look to determine whether reasonable consumers would believe that the infringing mark <u>is</u> the senior mark.[28]  Applying this test, it is apparent that

---

[28] Many of the cases imply, and at least one court has held, that the inquiry is not really whether the marks are substantially indistinguishable, but whether the marks are employed in such a way as to cause a consumer to believe that the product itself is counterfeit.  *See Ross*

Best Shot's Marks simply are not counterfeit as a matter of law. The Best Shot and Schneider Marks are readily discernable from each other: the Best Shot Marks include an entire word that the Schneider Marks do not. The marks, moreover, are visually distinguishable as they appear to consumers in the marketplace. For example, Best Shot's Marks appear in italics while Schneider's do not. Indeed, in the cases correctly proffered by Schneider analogous to the instant action, the specter of counterfeiting was not even raised. *See Daddy's Junky*, 109 F.3d at 288; *Induct-O-Matic*, 747 F.2d at 358; *see also Entrepreneur Media*, 279 F.3d at 1145 ("a reasonable juror might consider "'Entrepreneur' and 'Entrepreneur Illustrated' <u>dissimilar</u>.") (emphasis added); *Qwest Communs*, 124 F. Supp. 2d at 305 (discussing cases in which the addition of a single word has rendered a mark non-infringing). There simply is not a basis upon which reasonable jurors could find Best Shot's Marks counterfeit.[29]

---

*Cosmetics Distribution Ctrs. v. United States*, 18 C.I.T. 979, 985 (Ct. Int'l Trade 1994) ("Customs determined that plaintiff's use of the word marks … constituted a counterfeit use of these marks, because plaintiff applied marks 'identical to the registered trademarks' … [but] [i]t is clear that [the] products are not counterfeits [because they] do not imitate the well-known products … in <u>all details of construction and appearance</u>.") (emphasis added). However sensible this analysis given the general conception of "counterfeiting," the text of the Lanham Act is to the contrary. 15 U.S.C. § 1127 ("A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.").

[29] Best Shot asks for attorneys fees relating to this claim. The Lanham Act permits an award of reasonable attorneys' fees "in exceptional cases … to the prevailing party." *See* 15 U.S.C. § 1117(a); *see also Curcio Webb LLC v. Nat'l Ben. Programs Agency, Inc.*, 367 F. Supp. 2d 1191, 1200 (S.D. Ohio 2005). Indeed, one leading commentator has noted:

> Congress wished to discourage plaintiffs from making frivolous allegations of counterfeiting in an ordinary trademark infringement case in order to escalate the case by praying for recovery of the mandatory treble damages and attorney's fee remedies. When it is found that plaintiff sought treble damages in a case clearly not involving a counterfeit mark, it is appropriate for the court to use the attorney's fee provision of Lanham Act § 35(a) to require the plaintiff to pay the defendant's attorney's fees with respect to that portion of the lawsuit.

Accordingly, Best Shot's Motion for Partial Summary Judgment on the Issue of Trademark Counterfeiting is **GRANTED** and Schneider's Motion for Partial Summary Judgment on the Issue of Trademark Counterfeiting is **DENIED**.

## VII. WHETHER A MONETARY AWARD IS AVAILABLE

One critical question remains before the Court, which is whether Schneider may be entitled to an award of accounting of profits or damages on its claim of infringement.[30]  Best Shot asserts that both claims are barred.  First, Best Shot claims that disgorgement of a defendant's profits, an equitable remedy, is unavailable both because proof of willfulness is a perquisite to such relief and because it claims Schneider cannot establish willfulness as a matter of law.  Second, Best Shot argues that Schneider has failed to prove that it has suffered any losses in sales and, thus, may not recover money damages as recoupment.

Although both claims, particularly the latter, represent something of a close call, the Court nevertheless concludes that Schneider has offered enough to survive summary judgment. *Accord United States v. Honeywell Int'l, Inc.*, 542 F. Supp. 2d 1188, 1201 (E.D. Cal. 2008) ("The calculation of damages is not ordinarily amenable to resolution at the summary judgment

---

4 McCarthy § 30:94.  Nevertheless, as previously noted, this is a relatively new area of law, with a number of judicial glosses on the statutory scheme.  In light of this, the Court reserves judgment at this stage on whether such fees are appropriate here.  Indeed, although this Court does not believe the Act is so narrow as to only allow attorneys fees at the conclusion of the entire case, it is assuredly the better practice in most circumstances to wait for the resolution of the entire case prior to considering attorneys fees.  Best Shot's Motion for Attorney's Fees, is, consequently, **DENIED**.  Best Shot may choose to renew this motion or submit a different motion for attorneys fees at the conclusion of the case if it believes such action is appropriate at that time.

[30] Both parties brief this motion exclusively with respect to Schneider's claims under the Lanham Act, presumably because neither party believes that Ohio law would merit a different result.  The Court finds no reason to depart from this assumption.

stage…. [Only in] rare instances [are] damages … resolved on summary judgment."). Best

Shot's motion for partial summary judgment on monetary damages is, consequently, **DENIED**.[31]

### A.  Best Shot is Not Entitled to Judgment as a Matter of Law on Schneider's Claim for Unjust Enrichment.

#### 1.  Disgorgement of Profits is Available Under the Lanham Act Without Proving Willful Trademark Infringement

Best Shot first asserts that Schneider may not seek disgorgement of Best Shot's profits

unless Schneider proves willful infringement.  Although there is common law support for this

contention and trademark law has strong common law roots, the federal law of trademark is

codified in the Lanham Act.  Consequently, any analysis must start with the plain text of the Act.

Schneider alleges that Best Shot violated 15 U.S.C. § 1125 (a & d), which prohibit infringement

and counterfeiting.  As to such statutory violations, the Lanham Act states:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, **a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title**, shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

15 U.S.C. § 1117(a) (emphasis added).  It is apparent that the Lanham Act, by its own terms,

does not require "a willful violation" for disgorgement of profits as compensation for trademark

infringement.  *See Nike, Inc. v. Top Brand Co.*, No. 00-Civ.-8179, 2005 U.S. Dist. LEXIS 42374,

---

[31] As discussed *supra.*, the Court reserves any discussion on the possible award of attorneys fees until the conclusion of the case.  The Court does note, however, that attorneys fees are subject to an entirely different analysis than that discussed in this section – even if Schneider cannot collect actual damages or lost profits, this would not, by itself, preclude an award of fees if Schneider otherwise prevails on its infringement claims.

at *30-32 (S.D.N.Y. July 13, 2005) (Wood, J.) ("willfulness is not a prerequisite to recovery of profits for violations under Section 1125(a).").[32]  As Judge Wood explained:

> It is well settled that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Duncan v. Walker*, 533 U.S. 167 (2001).  Thus, the plain language of the statute indicates that willfulness is a prerequisite only when recovery of profits is sought for a violation of section 1125(c) – which prescribes remedies for dilution of famous marks.

*Id.* (other citations omitted).

Best Shot, however, points to extensive judicial precedent indicating that willfulness is a requirement for such an award.  What Best Shot misses, here, however, is that all of this precedent predates the current text of the Lanham Act, which was amended in 1999.  *See Powerhouse Marks*, 2006 U.S. Dist. LEXIS 4021, at *11 (collecting cases).[33]  Indeed, all of the appellate courts to have squarely considered this issue following the 1999 amendments expressly dispensed with the requirement of  bad faith.  *See Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006) ("[A]lthough willfulness is a proper and important factor in an

---

[32] This is contrasted with a claim for diminishment of a mark's value in violation of 15 U.S.C. § 1125(c), for which the Lanham Act <u>does</u> require "a willful violation."

[33] Although Best Shot does not cite to them, it is true that some district courts, particularly within the Second Circuit, continue to apply the requirement of willfulness even in the wake of the 1999 amendments.  *See, e.g.*, *Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.*, 570 F. Supp. 2d 498, 502 (E.D.N.Y. 2008) ("This court finds more convincing those cases holding that willfulness remains a requirement for the recovery of a defendant's profits.") (collecting cases).  Those cases, indeed, make a strong case that Congress had no intention of modifying infringement or counterfeiting law during the 1999 amendments.  *But see Banjo Buddies*, 399 F.3d at 173-75 ("We presume Congress was aware that most courts had consistently required a showing of willfulness prior to disgorgement of an infringer's profits in Lanham Act cases, despite the absence of the word "willful" in the statutory text prior to 1999.").  This Court will not substitute murky legislative history for plainly expressed statutory intent, however.  It is for the legislature, not the courts, to rewrite this statute should Congress desire an alternate result.

assessment of whether to make a damages award, it is not an essential predicate thereto."); *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 173-75 (3d Cir. 2005) (same); *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 348 (5th Cir. 2003) (same).[34]   Consequently, this Court is in full accord with its sister court in Michigan:

> The Sixth Circuit has not re-visited the issue of whether bad faith is a prerequisite to a disgorgement of the defendant's profits since the 1999 amendments.  This Court believes, however, that the Sixth Circuit would follow [other circuits] and find that the judicially imposed requirement has been superseded by statute.

*Powerhouse Marks*, 2006 U.S. Dist. LEXIS 4021, at *11.[35]   This Court finds that Schneider need not prove bad faith, or "willfulness" to recover profits.[36]

---

[34] This  question was at one point certified for interlocutory appeal to the Sixth Circuit. *See J-Rich Clinic, Inc. v. Cosmedic Concepts, Inc.*, No. 03-CV-71750, 2006 U.S. Dist. LEXIS 60366, at *10 (E.D. Mich. Aug. 25, 2006) ("[T]he following question is certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b): Is a finding of willfulness or bad faith a mandatory prerequisite to an accounting for profits under § 35(a) of the Lanham Act?"). Fortunately for the parties to that action, but less fortunately for subsequent trial courts, this case appears to have settled before the Sixth Circuit had the opportunity to rule.

[35] Prior Sixth Circuit precedent is conflicting.  *Compare Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 606 (6th Cir. 1991) ("[T]here is no express requirement that the parties be in direct competition or that the infringer willfully infringe the trade dress to justify an award of profits.") (citing *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir. 1989)) *with Frisch's Restaurants v. Elby's Big Boy*, 849 F.2d 1012, 1015 (6th Cir. 1988) ("For a court to order an accounting … bad faith must be shown.") (citing *Nalpac, Ltd. v. Corning Glass Works*, 784 F.2d 752, 755 (6th Cir. 1986)).

[36] Even if the Sixth Circuit ultimately were to conclude that "willfulness" were a requirement for disgorgement of profits, Best Shot still would not be entitled to judgment as a matter of law.  Although, as indicated during the Court's analysis of the *Frisch* factors, Schneider's evidence of willfulness is not particularly strong, the existence of willfulness is generally not the Court's determination to make.  *See First Dakota Nat'l Bank v. Saint Paul Fire & Marine Ins. Co.*, 2 F.3d 801, 811 (8th Cir. 1993) ("Intent is a quintessential jury issue."); *Bustos v. Whitley County Consol. Sch.*, No. 1:07-CV-116, 2009 U.S. Dist. LEXIS 6157, at *20 (N.D. Ind. Jan. 28, 2009) (same).

### 2. The Lanham Act Allows a Plaintiff to Recover a Defendant's Excess Profits, Even When that Plaintiff Does Not Point to Specific Diversions of its Sales.

Finally, Best Shot incorrectly argues that it is only appropriate for this Court to award an accounting of profits if Schneider can prove that specific, identifiable, sales were actually diverted from Schneider to Best Shot.  As an initial matter, this proposition is in tension with the text of the Lanham Act:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this Act, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover **(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.**

15 U.S.C. § 1117(a) (emphasis added).  Although not dispositive, the text does indicate that "profits" are considered separately from "damages sustained by the plaintiff."  This indicates that Congress likely did not intend for a plaintiff to have to prove the amount of one (damages) in order to receive the other (lost profits).

Sixth Circuit precedent is similarly hostile to Best Shot's proposed interpretation.  *See Balance Dynamics Corp. v. Schmitt Industries, Inc.*, 204 F.3d 683 (6th Cir. 2000).  Best Shot cites *Balance Dynamics* as favorable to its assertion, presumably because that court held that a precise calculation of lost sales is an essential precursor to the award of lost profits.  *Balance Dynamics*, however, is a false advertising case, and it specifically distinguished false advertising from trademark infringement, where "one of the trial court's primary functions is to make violations of the Lanham Act unprofitable to the infringing party. . . ." *Id*. at 695, n. 6 (citing *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 606-07 (6th Cir. 1991)); *see also Powerhouse Marks*, 2006 U.S. Dist. LEXIS 4021, at *7 ("As this is not a false advertising case,

the Court will adhere to the Sixth Circuit's holding in *Wynn Oil* and hold that Powerhouse's lack of evidence of actual confusion does not bar a monetary award.").

When this Court considers both the plain statutory text of the Lanham Act and existing Sixth Circuit precedent, it seems clear that Schneider need not show a particular diversion of its own sales to recover profits from Best Shot.  *See id.*[37]

### B. Best Shot's Motion for Summary Judgment on Schneider's Claim for Money Damages is also Denied

#### 1. Although the Lanham Act Requires Neither Bad Faith Nor the Demonstration of Exact Damages, it is True that Schneider Must Still Show Some Injury to be Entitled to Damages.

Best Shot argues that, not only are lost profits unavailable to Schneider on this record, but Schneider is also not entitled to an award of its own damages because Schneider is unable to demonstrate any injury.  Indeed, while Schneider need not demonstrate "the exact amount of damages" or actual consumer confusion, Schneider still must demonstrate some damage to itself to be entitled to this form of monetary relief.  *Jeffrey Chain, L.P. v. Tropodyne Corp.*, No. 99-6268, 2000 U.S. App. LEXIS 33926, at *13 (6th Cir. Dec. 20, 2000) *cert denied Chain v. Tropodyne Corp.*, 533 U.S. 931 (2001)) ("[C]ourts draw a sharp distinction between proof of the fact of damage and proof of the amount of damage.") (citations omitted).  It is clear that, "[t]o be entitled to damages, the plaintiff must prove that some damages were the certain result of the wrong . . . Damages are precluded where the damage claimed is not the certain result of the wrong."  *Id.* (quotations omitted).  Critically, "[t]his is distinct from a situation  where the amount of damages is uncertain." *Powerhouse Marks*, 2006 U.S. Dist. LEXIS 4021, at *5-6 (emphasis in original) (citations omitted).  In this case, to be entitled to damages under the second prong of §1117(a), Schneider would need to produce evidence that Best Shot's

---

[37] The ability to show damages, however, is a substantial equitable consideration.

infringement has somehow damaged Schneider, presumably by some diversion of sales from Schneider to Best Shot.  Schneider is not, however, under an obligation to prove the amount of that damage to the degree of certainty required in other tort cases.

Schneider is simply incorrect when it argues that it need only demonstrate infringement to receive damages (Doc. 83 at 16).  *See Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203 (1942).  Although Schneider points the Court to *Mishawaka*, this case explains that the holder of a senior mark must prove both "[i]nfringement <u>and</u> damage."  *Id.* at 206 (emphasis added).  *Mishawaka* does indeed emphasize the point already discussed, that, once the plaintiff demonstrates damage, the burden is not on the plaintiff to precisely quantify that damage.  *Mishawaka*, 316 U.S. at 206 ("Congress did not put upon the despoiled the burden – as often as not impossible to sustain – of showing that but for the defendant's unlawful use of the mark, particular customers would have purchased the plaintiff's goods.").   Nevertheless, Schneider still must bring forth evidence to  allow a reasonable jury to connect damage with Best Shot's alleged infringement.

### 2.  A Jury Could Properly Conclude that Schneider was Damaged by Best Shot's Infringement.

Schneider's opposition to Best Shot's motion for partial summary judgment on the issue of damages includes only meager citations to the record in support of its assertion that it was damaged as a result of Best Shot's alleged infringement.  The Court could, arguably, grant Best Shot's motion for this reason.  *See Magnum Towing*, 287 Fed. Appx. at 449 ("It is not the district court's (or our) duty to search through the record to develop a party's claims; the litigant must direct the court to evidence in support of its arguments.") (citations omitted); *U.S. Structures*, 130 F.3d at 1191 ("[T]he non-moving party must cite specific portions of the record . . . [so] that

the court is not required to search the record for some piece of evidence which might stave off summary judgment.").

Schneider does point out, however, that the deposition of one of its witnesses establishes "a genuine issue of material fact as to whether or not sales have been diverted from Schneider Saddlery as a result of Best Shot's infringement" (Doc. 83 at 25) and the Court has examined that witness' deposition (*see* Doc. 74 Ex. F).[38]  This witness testified that Schneider saw a drop in sales in the one catalogue where Schneider and Best Shot competed.  (*Id.* at 226-27.)  Best Shot does not deny either that this drop in sales occurred or that there is evidence in the record of that fact.  It argues, instead, that a one-year drop in sales is insufficient as a matter of law to establish damages.  Although this is an unquestionably close call, evidence of a decrease in sales in the one forum where the products compete side-by-side might sustain a claim for damages.[39] Again, Schneider's evidence need not be particularly strong on this point, it need only be enough to create a genuine issue of fact as to this fact-specific inquiry.

Consequently, Best Shot's Motion for Partial Summary Judgment on the Issue of Money Damages (Doc. 74), though strong, must be **<u>DENIED</u>**.

---

[38]  To be precise, the Court has examined the portions of this deposition that were submitted by Best Shot in connection with this motion.  The Court assumes that Schneider is referring to this portion of the deposition in its opposition.

[39] The Court notes that Schneider is mistaken to argue that "if Best Shot's conduct is deemed to create enough irreparable harm to merit an injunction, there is little logic in the notion that Best Shot should be permitted to keep the fruits of its infringing use."  (Doc. 83 at 19-20.) An injunction prevents future harm from occurring; damages remedy past harm.  A mark can infringe, and thus have the potential to create future harm, without having actually created any harm as of the time of suit.  *See, e.g.*, *Star Fin. Servs. v. Aastar Mortg. Corp.*, 89 F.3d 5, 8 (1st Cir. 1996).  Alternately, even if it would be logical to assume past harm from the fact of infringement, the Court must be governed by record evidence, not assumptions, no matter how logical.

## VIII. CONCLUSION

For the aforementioned reasons, Best Shot's Motion for Partial Summary Judgment on Trademark Counterfeiting (Doc. 75) and Schneider's Motion to Strike Certain Evidence (Doc. 90) are **GRANTED IN PART**, and Best Shot's Motion for Partial Summary Judgment on Money Damages (Doc. 74) and Schneider's Motion for Partial Summary Judgment (Doc. 76) are **DENIED**.

**IT IS SO ORDERED.**

         **s/Kathleen M. O'Malley**
         **KATHLEEN McDONALD O'MALLEY**
         **UNITED STATES DISTRICT JUDGE**

**Dated: March 31, 2009**